*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* STORM, CLOUD, MOON, TRUTH Minors.

UNPUBLISHED
June 11, 2019

No. 346592
Kalamazoo Circuit Court
Family Division
LC No. 2016-000453-NA

Before: K. F. KELLY, P.J., and FORT HOOD and REDFORD, JJ.

PER CURIAM.

Respondent-mother appeals as of right from the trial court's order terminating her parental rights to her minor children, TS, SC, GM and TT pursuant to MCL 712A.19b(c)(*i*) (conditions leading to adjudication continue to exist), (c)(*ii*) (failure to rectify other conditions) (g) (failure to provide proper care and custody) and (j) (reasonable likelihood that the child will be harmed if returned to the home of the parent).[1] We affirm.

## I. BACKGROUND

Respondent gave birth to triplet girls, TS, SC and GM on September 11, 2016. As pertinent to this appeal, respondent was already the mother to TT, born December 28, 2013.

This case originated in the lower court when petitioner filed a petition on September 27, 2016 seeking removal of the minor children from respondent's custody. The petition alleged that respondent's rights to her other children, TW and CM, had been terminated on November 18, 2013, and that the "[b]arriers to reunification in the past still exist today." Specifically, petitioner alleged that respondent did not have independent housing, she was unemployed, and that she did not have the financial resources to care for her children. The triplets were still in the hospital following their birth at the time the petition was filed, and were ready to be discharged from the hospital. At the time, respondent was staying with a relative in a three-bedroom doublewide

---

[1] In the same order, the trial court terminated the parental rights of the father of the four children, but he is not a party to this appeal.

trailer and only had access to one bedroom, which was not sufficient space for her and the four children. Respondent also did not have the necessary furniture for her children or car seats. Petitioner alleged that respondent was not addressing her mental health issues, including depression and anxiety, and by her own admission, she was not taking her medication. The petition also alleged that respondent "struggled with managing her emotions, which places the children at risk of harm." According to the petition, respondent was involved in an intimate relationship with the father of the four minor children at issue in this appeal and she allowed TW and CM to witness domestic violence, and she also allowed her partner to physically abuse TW. The trial court authorized the petition and the triplets were placed in foster care.

On March 9, 2017, TT was removed from respondent's custody on an emergency basis because respondent was not compliant with her medication and had shared that she was afraid of harming the child. Throughout the lower court proceedings, the Department of Health and Human Services provided respondent with supports such as counselling, prescription medication reviews, a parenting coach and other parenting support, assistance with obtaining independent housing and a stable income, and respondent was required to comply with random drug screening. Respondent underwent two psychological evaluations during the course of the lower court proceedings and was diagnosed with "personality disorder with mixed features with predominant antisocial personality pattern; cannabis use disorder, moderate, in partial remission; unspecified bipolar and related disorder; [and] child neglect." Respondent also participated in supervised parenting time with her children twice a week. During parenting time, respondent struggled with parenting TT, who was traumatized following his separation from respondent and who exhibited angry and aggressive behavior toward respondent and his sisters. On the day of the termination hearing, respondent voluntarily and by her own initiative consented to termination of her parental rights to all four minor children. After concluding that termination of respondent's parental rights was in the best interests of the minor children, the trial court entered an order terminating her parental rights. Respondent now appeals as of right.

## II. RESPONDENT'S CONSENT TO TERMINATION OF HER PARENTAL RIGHTS

On appeal, respondent first claims that the trial court erred in accepting her plea to terminate her parental rights because it was not knowing and voluntary. We disagree.

The parties both agree that this unpreserved issue is reviewed for plain error affecting respondent's substantial rights. *In re Utrera*, 281 Mich App 1, 8-9; 761 NW2d 253 (2008).

> To avoid forfeiture under the plain error rule, three requirements must be met: 1) the error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights. [*In re VanDalen*, 293 Mich App 120, 135; 809 NW2d 412 (2011).]

In *In re Toler*, 193 Mich App 474, 477; 484 NW2d 672 (1992), this Court recognized that a respondent "can consent to termination of his parental rights under the juvenile code, in which case the [trial court] need not announce a statutory basis for [the termination of parental rights]."

The *In re Toler* Court articulated this reasoning following its citation to MCR 5.974,[2] noting that before terminating a respondent's parental rights, the trial court is obligated, pursuant to the court rule, to make factual findings, state its conclusions of law and specify the statutory basis for its order.

On appeal in this case, the thrust of respondent's allegations pertain to her claim that her consent to termination of her parental rights was not knowing and voluntary. In making this argument, respondent attempts to place responsibility on the trial court for her decision to give consent to the termination of her parental rights, alleging that she only did so because the trial court had informed her at the August 10, 2018 hearing on respondent's motion seeking a substitution of counsel that termination of her parental rights was essentially inevitable.

In the context of the adjudicative[3] trial portion of termination of parental rights proceedings, MCR 3.971, provides, in pertinent part, as follows:

**(C) Voluntary, Accurate Plea**.

(1) *Voluntary Plea*. The court shall not accept a plea of admission or of no contest without satisfying itself that the plea is knowingly, understandingly, and voluntarily made.

See also *In re Burns*, 236 Mich App 291, 292; 599 NW2d 783 (1999) (recognizing that in an action pursuant to the Adoption Code, MCL 710.21 *et seq*., an individual's release of parental rights must be knowing and voluntary).

Similarly, in the context of criminal proceedings, the Michigan Supreme Court has recognized that, to satisfy constitutional protections provided by the Due Process Clause of the Fourteenth Amendment, a plea is required to be "voluntary and knowing." *People v Cole*, 491 Mich 325, 333; 817 NW2d 497 (2012). The Court will consider a plea voluntary and knowing if it represents a voluntary and informed choice concerning the alternate choices available to the individual. *Id*. In discerning whether a plea is made in a voluntary manner, the Court must decide whether the plea was entered by one "'fully aware of the direct consequences of the plea.'" *Id*., quoting *Brady v United States*, 397 US 742, 755; 90 S Ct 1463; 25 L Ed 2d 747 (1970).

In the present case, when the trial court convened for the termination hearing scheduled to be held on October 2, 2018, it noted immediately on the record that respondent wanted to consent to the termination of her parental rights:

---

[2] The applicable court rule is now MCR 3.977(I)(1).

[3] While respondent's argument does not pertain to the adjudicative portion of the lower court proceedings, we nonetheless conclude that MCR 3.971 is of utility in our analysis of this issue.

*The Court*.  And we were scheduled today for a termination hearing on mother and father out of the box but I understand Ms. Kirkpatrick your client would like to consent to the termination language, is that accurate?

*Ms. Kirkpatrick* (respondent's counsel).  It is Your Honor.  And to that on to [sic] my client has signed a consent to termination of her parental rights this morning in my presence.

*The Court*.  Okay.

*Ms. Kirkpatrick* (respondent's counsel)  And we have submitted that copy to the Court.

*The Court*.  I do have it.  All right.  Thank you.  That's your understanding as well Ms. Gleason?

*Ms. Gleason (Guardian Ad-Litem)*.  That is.

*The Court*.  All right.  So [respondent], go ahead and raise your right hand please so I can ask you some questions.  Do you swear or affirm that the testimony you are about to give is the truth, the whole truth and nothing but the truth so help you God?

*Respondent*.  Yes I do Your Honor.

\* \* \*

*The Court*.  Okay.  We are scheduled today for a termination hearing so we've got the entire day scheduled.  You do not want a trial, is that true?

*Respondent*.  No, I've had some time to think since our last Court date and this has been too much.  It's made me mentally worse.  I haven't gotten better, I've gotten worse.

*The Court*.  Okay.

*Respondent*.  This is stressful for my children.  [The foster parents] have had the girls since they came home from the hospital.  They were just sick and [SC] didn't even want me to hold her.  Like I went to see them in the hospital.

*The Court*.  Okay.

*Respondent*.  She – they are – they do belong to [the foster parents].  Like they've been there, they think they are – the girls think that [the foster parents] are their real parents I'm sure.

*The Court*.  Okay.  All right.

*Respondent.* And [TT], I did want to fight for [TT] but the Prosecuting Attorney is saying that it's all or nothing.

*The Court.* Okay. Well --

*Respondent.* So I'm stuck here.

*The Court.* We've scheduled an entire day for a trial. Are you telling me that you don't want the trial; you would rather do this of your own free will? So the trial would require the Prosecutor to put on witnesses, your attorney to cross-examine those witnesses. Your attorney has the right to put on her own witnesses so that would take the entire day and maybe more, if we could finish today or not. I know we had scheduled termination way back in 2016 and they took it off the table and then we scheduled termination back in August, we got you a new attorney, so it's been a long time. Your children were removed September 27th of 2016, so it's been more than two years. But I need to ask you all of these questions so I want to make sure you don't want your trial today, is that true?

*Respondent.* The last time I sat in this courtroom, you told me that I was only delaying the inevitable. So no matter what is said today, you and I both know that the children will be terminating – my rights will be terminated, so yes, I would rather just go through this little bit right now of torture than all day.

*The Court.* Okay. So has anybody forced you --

*Respondent.* No.

*The Court.* --to plea [sic] to this today – or consented [sic] to this today? Has anybody promised you anything?

*Respondent.* No.

*The Court.* So this is completely of your own free will to not go through the trial today where I can hear all the --?

*Respondent.* You said I was delaying the inevitable so yes.

*The Court.* I don't remember that. I've had hundreds of terminations --

*Respondent.* It's all on the record.

*The Court.* – and today I would be able to hear all the evidence. If you want me to hear the evidence so that I can make a decision whether or not the facts in the petition have been proven, that's what you know and I don't know. So I – I can't believe I would ever make a statement like that. We can go back and look at transcripts but if that's what you think that I think I am sorry, that is not true. I would listen to all of the evidence if we were to have a trial, I'm not trying to talk you into a trial, I just want to make sure you understand that it's

completely your decision whether or not you go through a trial to have me hear evidence[,] whether the prosecution has proven what they are alleging in the petition. Now if they prove what's in the petition, it would be likely that I would terminate your parental rights.

*Respondent.* You are going to because they can prove everything. I would like [the foster parents] to adopt my children—

*The Court.* All right.

*Respondent.* They are awesome. They rock. My children have the best chances for a bright future with them and not me –

*The Court.* So you--

*Respondent.* and we all know this.

*The Court.* Go ahead. Sorry. Go ahead.

*Respondent.* So yes, let's go through it.

*The Court.* All right. Do you understand that if you consent to this today that this consent or plea could later be used as evidence in a proceeding to terminate parental rights in the future. Have you talked to your attorney about that?

*Respondent.* My tubes are tied. That's not even a problem.

*The Court.* So it's your understanding you won't have any other children?

*Respondent.* Yes, it's definitely my understanding. I did it on purpose.

*The Court.* And so let me ask you one more time and I know we ask at every hearing but that's what the federal law requires, are you a member of any American Indian tribe?

*Respondent.* No, I am not.

*The Court.* And so let me read what you are saying in the consent to terminate. Is it true, um, so –I'm just going to read the consent. That now comes [respondent], mother of [TS], [SC], [GM] and [TT] and respectfully acknowledges that without regard to intent that you – that she has been unable to provide proper care and custody and will be unable to do so within a reasonable amount of time considering the age of the children. Is that true?

*Respondent.* I did sign that paperwork.

*The Court.* Okay and [respondent] has come to the difficult and loving conclusion that consenting to the termination of her parental rights would be in the best interests of the minors. Is that true?

*Respondent.* Yes it will be.

*The Court.* And therefore the mother, [respondent] admits that statutory grounds to terminate her parental rights exists by clear and convincing evidence under MCL 712A.19b and that it is in the best interest of the minors by a preponderance of the evidence that her rights be terminated to the minor children and therefore she consents to the termination of her parental rights to [TS, SC, GM and TT]. Is that accurate?

*Respondent.* Yes.

*The Court.* Okay.

\* \* \*

*The Court.* . . . so I do accept the plea. It's knowingly, voluntarily and accurately made and I accept the consent to terminate and it's according to mom's wishes, I do find it would be in [the minor children's] best interest to do so.

*Respondent.* You were going to anyway.

*The Court.* I'm sorry?

*Respondent.* I said you were going to anyway. Can I leave?

*The Court.* I don't know if that would be true. And so let me make sure that you know what your rights [following termination of parental rights] are.

After being informed of her rights following termination of her parental rights, with the permission of the trial court, respondent was then discharged from the proceedings and left the courtroom. As a matter of background, respondent, during her colloquy with the trial court, was apparently referring to the trial court's comments made during the August 10, 2018 hearing on her motion seeking a substitution of counsel when the trial court observed that the termination hearing scheduled for August 16, 2018 would need to be adjourned to a later date. In pertinent part, the trial court stated:

So, I am going to grant your motion and we'll get you a substitute attorney um, although I've got to say Attorney Martell has advocated extremely zealous [sic] for you in my opinion and he's an excellent attorney. *Um, but I understand, if you don't feel that he is working hard enough for you and you want someone else, but I have to weigh if it's just a request to delay the inevitable, if that's the case, or if it's truly a breakdown of your relationship* and I don't know but as long as you guys are both agreeing that you both want to just be done and you will start

with an [sic] new attorney fresh, um, and we're going to reschedule the termination hearing then as well. Okay? [Emphasis added.]

The trial court's comments at issue followed its pointing out to respondent's current counsel its concern that the termination hearing would need to be adjourned on very short notice. Accordingly, a review of the record demonstrates that rather than informing respondent that termination of her parental rights was inevitable, the trial court was clearly expressing its concern that a substitution of counsel not be used as a procedural matter to delay the occurrence of the termination hearing. Moreover, the record reflects that respondent made a voluntary and informed choice when she chose to terminate her parental rights, particularly given that the trial court clearly explained to respondent that she had the right to have a termination hearing conducted, and that the trial court had set aside a day for the hearing and would set aside more time if necessary. The trial court also shared with respondent that she had the right to call witnesses on her behalf at the hearing, and that her counsel could cross-examine the witnesses. Moreover, the trial court informed respondent that the prosecution was required to prove the allegations in the petition before her rights could be terminated. Under these circumstances, it was clear that respondent was made aware of the alternative choices that were available to her. *Cole*, 491 Mich at 333. While respondent claims on appeal that her consent to termination of her parental rights was not voluntary, it is apparent from the record that she knew the consequences of her choice, that her consent would result in her parental rights being terminated, particularly given that she stated that she wanted the foster parents to adopt her children, and she knew that they would be good parents to her children. *Id*. Accordingly, respondent's claim that her consent to termination of her parental rights was anything but knowing and voluntary is simply unpersuasive.

## III. BEST INTERESTS ANALYSIS

On appeal, respondent next claims that the trial court erred in concluding that it was in the best interests of her minor children to terminate her parental rights. We disagree.

## A. REUNIFICATION EFFORTS

As a preliminary matter, respondent makes a cursory allegation in her brief on appeal that DHHS did not undertake reasonable efforts to reunify respondent with her family. As a general matter, this Court will review a trial court's factual findings regarding whether DHHS undertook reasonable efforts to reunify respondent with the four minor children for clear error. *In re Fried*, 266 Mich App 535, 542; 702 NW2d 192 (2005). However, to preserve a challenge to the efforts that DHHS undertook to reunify a family, a respondent is required to raise the issue in the trial court when services were first offered. Accordingly, this issue is not preserved for this Court's review. *In re Frey*, 297 Mich App 242, 247; 824 NW2d 569 (2012).[4] It is therefore reviewed for plain error affecting respondent's substantial rights. *In re VanDalen*, 293 Mich App at 135.

---

[4] While the Michigan Supreme Court has expressed skepticism concerning this rule, it has declined to disturb it. See *In re Hicks*, 500 Mich 79, 88-89; 893 NW2d 637 (2017) ("While

As the Michigan Supreme Court recognized in *In re Hicks*, 500 Mich 79, 85-86; 893 NW2d 637 (2017):

> Under Michigan's Probate Code, the Department has an affirmative duty to make reasonable efforts to reunify a family before seeking termination of parental rights. MCL 712A.18f(3)(b) and (c); MCL 712A.19a(2). As part of these reasonable efforts, the Department must create a service plan outlining the steps that both it and the parent will take to rectify the issues that led to court involvement and to achieve reunification. MCL 712A.18f(3)(d) (stating that the service plan shall include a "[s]chedule of services to be provided to the parent . . . to facilitate the child's return to his or her home").

Respondent does not elaborate on her bare allegation that reasonable efforts were not made with the goal of reunification, specifying what supports and services that she ought to have been provided that she was not, but instead states that she was not given ample opportunity to demonstrate that she was able to provide a safe and stable home for the minor children following her intensive therapy. Respondent also argues that it is clear from the caseworker's report given during the April 25, 2018 permanency planning hearing that "[the caseworker made no effort whatsoever to work with [respondent] and did not comply with the statutory and case law requirement that [DHHS] work toward reunification." Given that respondent only affords perfunctory treatment to this issue in her brief on appeal, we may consider the issue waived. *Prince v MacDonald*, 237 Mich App 186, 197; 602 NW2d 834 (1999). Even considering the merits of respondent's argument, it is unsuccessful.

In support of her challenge to DHHS's reunification efforts, respondent points to this Court's decision in *In re Newman*, 189 Mich App 61; 472 NW2d 38 (1991). In *In re Newman*, the respondents, one of whom had "limited intellectual capacity" had their parental rights terminated. *Id*. at 64. On appeal, the respondents challenged the termination of their parental rights and this Court concluded that the trial court erred in terminating their parental rights on the basis of the dirty and unkempt conditions in their home "because [the] respondents were not given a full and fair opportunity to maintain the home." *Id*. at 67. Notably, this Court observed that because one of the respondents had limited intellectual capacity, they needed intensive, "hands-on" instruction with regard to how to maintain their home, but the housekeeper that was supposed to help them refused to go into the home because it was so dirty. *Id*. at 66. The Court also recognized that the respondents had shown "an ability and willingness to learn" and had attempted to provide a clean home well-stocked with food, and that they had also complied with objectives in their parent-agency agreement. *Id*. The Court also observed that the respondents were not given the opportunity to demonstrate that they could parent their children without the presence of one of their children who had problematic behavior and who professionals could not even control. *Id*. at 68-69. *In re Newman* is factually distinguishable from the present case, in

---

skeptical of this categorical rule, we have no occasion to decide whether the objection in this case was timely because neither the Department nor the children's lawyer-guardian ad litem raised a timeliness concern in the circuit court.").

that respondent cannot be said to be show the willingness to learn and change, particularly given that she repeatedly, and over the course of an almost two-year period, failed to comply with the requirements of her parent-agency treatment plan. The present case is therefore not one in which respondent was not provided ample supports and the time to demonstrate that she could do better. Instead, respondent, despite being provided ample support, repeatedly showed that she was not making the progress necessary to maintain a safe and stable environment for her children and to reunify the family.

Put simply, the record does not support respondent's contentions that (1) respondent was not given ample opportunity to demonstrate that she could provide a safe and stable home for her children and (2) DHHS did not undertake reasonable efforts to reunify respondent with her family. This case originated in September 2016 when DHHS's initial petition was first authorized and the triplets were placed into care following their discharge from the hospital at birth and TT was permitted to remain in respondent's custody. TT was subsequently removed from respondent's custody on an emergency basis on March 9, 2017 because respondent was not complying with her medication. Throughout these proceedings, DHHS provided support to respondent with seeking stable and independent housing, providing counselling and prescription medication reviews, and assisted her with finding stable employment. Respondent was also required to participate in random drug screens on a regular basis. Respondent also participated in parenting time twice a week, she received the support of a parenting coach and was given ample opportunity to demonstrate that she could parent her children in a safe and effective manner. Rather than doing so, respondent struggled with complying with and benefiting from the services that were offered to her, and she was particularly challenged with parenting TT, and dealing with his angry and aggressive behavior, often becoming angry and aggressive herself. When respondent's rights were finally terminated, the case had been ongoing for over two years. While DHHS bears the responsibility of making reasonable efforts to reunify a family, "there exists a commensurate responsibility on the part of respondent[ ] to participate in the services that are offered." *In re Frey*, 297 Mich App at 248. Respondent also was required to demonstrate that she benefited from the services offered to her. *Id*. During the April 25, 2018 permanency planning hearing, caseworker Julie Griggs reported that respondent, professing to be too busy with her work circulating petitions to be signed, was not attending counselling and had not taken a drug test since March 13, 2018. Respondent was also not complying with the requirement that she obtain suitable housing because she was residing with the father of the children. Accordingly, a close review of the record simply undermines respondent's claims and her arguments that DHHS did not undertake reasonable efforts to reunify her family are unavailing.

## B. BEST INTERESTS

Generally, this Court reviews for clear error a trial court's determination regarding the best interests of the minor children. MCR 3.977(K); *In re Hudson*, 294 Mich App 261, 264; 817 NW2d 115 (2011). However, respondent did not preserve her allegation of error with respect to the trial court's best interest determination. As petitioner acknowledges in its brief on appeal, respondent expressly agreed that termination of her parental rights was in her children's best interest, therefore she has waived any allegation of error. See *LME v ARS*, 261 Mich App 273, 277; 680 NW2d 902 (2004) (acknowledging that petitioners waived a claim challenging the trial court's jurisdiction to order child support as they expressly agreed to the trial court's jurisdiction

to order child support and "waiver is the intentional abandonment of a known right and extinguishes any error."). Even setting aside any issue of waiver, this Court reviews respondent's argument challenging the trial court's best interest determination for plain error given that it is unpreserved. *In re Utrera*, 281 Mich App at 8-9.

MCL 712A.19b(5) provides:

(5) If the court finds that there are grounds for termination of parental rights *and that termination of parental rights is in the child's best interests*, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made. [Emphasis added.]

The trial court determines, according to a preponderance of the evidence standard, whether termination of parental rights is in the best interests of the minor children. *In re CMR Kaczkowski, Minor*, 325 Mich App 69, 78; 924 NW2d 1 (2018). This Court has recently set forth the factors a trial court should consider when evaluating the best interests of the minor children:

Factors to be considered include "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." [*In re Olive Metts/Minors*, 297 Mich App 35, 41-42; 823 NW2d 144 (2012) (citations omitted)]. A court may also consider whether it is likely "that the child could be returned to her parents' home within the foreseeable future, if at all." [*In re Frey*, 297 Mich App at 249]. [*In re Kaczkowski*, 325 Mich App at 78.]

The trial court's best interests determination was not clearly erroneous and is well supported by the record. *Hudson*, 294 Mich App at 264. Specifically, the record demonstrates that throughout the lower court proceedings, respondent struggled with maintaining stable employment, going through several different jobs, and at the time of the termination of her parental rights, she had still not obtained a stable income. Additionally, respondent could not maintain independent housing, and was essentially transient through the course of these proceedings, moving from the home of one relative to another and at the close of these proceedings was living in Union City, Michigan with her mother. Moreover, as the lower court proceedings came to a close, respondent was not attending parenting time consistently, and throughout this case she struggled with parenting TT during parenting times, and on more than one occasion became angry and emotionally elevated when dealing with his challenging behavior. Respondent had also maintained contact with the father of her children, living with him at one point, despite the trial court ordering that she not have contact with him because of his physically abusive behavior to her and her children. Respondent is a former methamphetamine user, and she admitted to using marijuana during her pregnancy with the triplets, as well as during the course of the lower court proceedings, and tested positive for THC on multiple occasions during the random drug screening process. While respondent was no doubt bonded with all four children, the fact remains that the triplets had never lived with her or spent significant time with her outside of her parenting time, and the foster parents had been their primary caregivers their entire lives. Moreover, while respondent and TT were very much bonded, he was removed from respondent's home because of her inability to consistently take

her medication, a problem she struggled with throughout these proceedings, and these proceedings had taken a toll on TT to the extent that he was acting out aggressively and exhibiting anger, and a trauma assessment was performed. At the time of the termination hearing, the triplets had been in care for two years, and TT for 18 months. All four children needed permanency, stability and finality, and the foster home offered safety, security and stability for all of them. The record reflects that all four children were thriving and doing well in their placement together. Additionally, respondent, who was diagnosed with serious mental health issues requiring assistance, also struggled with attending counselling and taking her prescribed medication on a regular basis. Under these circumstances, the trial court did not clearly err in concluding that termination of respondent's parental rights was in the best interests of the minor children.

Affirmed.

/s/ Kirsten Frank Kelly
/s/ Karen M. Fort Hood
/s/ James Robert Redford